United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 9, 2004**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

No. 01-20881

---

ARLEEN MADDUX,ET AL,                                              Plaintiffs,

ARLEEN MADDUX,                                          Plaintiff-Appellant,


versus


OFFICER ONE; ET AL,                                              Defendants,

CITY OF PASADENA,                                       Defendant-Appellee.

---

Appeal from the United States District Court
For the Southern District of Texas
(H-99-CV-855)

---

BEFORE WIENER and BARKSDALE, Circuit Judges, and FURGESON,[*]
District Judge.

FURGESON, District Judge:[**]

Whether to grant a judgment as a matter of law in a civil

rights jury trial can present unique challenges for any district

court.  Such was the case for the trial judge in this appeal.  We

conclude that the learned court below erred when it granted the

---

[*] United States District Judge for the Western District of
Texas, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

motion and we thus reverse.

Appellant Arleen Maddux's claim under 42 U.S.C. § 1983 is premised on an alleged violation of her Fourth Amendment rights. She alleges that City of Pasadena ("City") police officers entered her home intent upon executing a felony arrest warrant, the subject of which was reasonably believed to be in her residence or that of a nearby neighbor, in the absence of consent, exigent circumstances, or a search warrant. She contends that the officers' entry contravened the United States Supreme Court's holding in *Steagald v. United States*[1] that absent consent, exigent

_____

1 451 U.S. 204 (1983). Petitioner Gary Steagald was indicted on federal drug charges after Drug Enforcement Administration agents discovered cocaine in Steagald's house during their search for the subject of an outstanding felony arrest warrant. A confidential informant tipped off the agents that the subject of the warrant could be reached at the phone number matching that belonging to the Steagald residence. DEA agents entered the Steagald residence without the consent of the individual who answered the door and searched for the subject of the warrant. DEA agents conducted a second search, which revealed additional incriminating evidence. It was after securing a search warrant for still another search that DEA agents found the cocaine. Steagald moved to suppress all evidence uncovered during the searches, because the DEA agents had failed to obtain a search warrant before entering the house. The district court denied the motion. A divided panel of judges of this Circuit affirmed, in reliance on a previous decision, finding that it was unnecessary for an officer to obtain a search warrant to enter a third-party premises to arrest the subject of an arrest warrant, so long as the warrant was valid and the officer had a reasonable belief that the subject was within the third-party premises. *United States v. Cravero*, 545 F.2d 406, 421 (1976), *cert. denied*, 430 U.S. 983 (1977). The search at issue in *Steagald* had taken place in the absence of either consent or exigent circumstances, leaving the Court to determine whether the arrest warrant alone was adequate to protect the Fourth Amendment interests of the third party whose home DEA agents had entered to search for the subject of the arrest warrant. Justice Marshall, writing for the majority, held that "in order to render the instant search reasonable under the Fourth Amendment, a search warrant was required." *Steagald*, 451 U.S. at 222. In doing so, the majority weighed the additional burden on law enforcement officers attendant to a warrant requirement against the

circumstances, or a search warrant, law enforcement officers may not, consistent with the Fourth Amendment, enter a third-party residence to apprehend the subject of an arrest warrant.

## I. Facts and Proceedings

### A. Facts

Maddux, and other Plaintiffs not joining in this appeal, brought suit against the City and eight of its police officers, alleging various federal- and state-law causes of action arising out of City officers' execution of a valid felony arrest warrant on June 3, 1998. A confidential informant had advised officers that the subject of an outstanding felony arrest warrant could be found at his residence, 2635 Goldenrod in Pasadena. Arleen Maddux and her husband, James Maddux, lived in a neighboring house at 2631 Goldenrod. Acting on the information furnished by the confidential informant, an officer surveilled 2635 Goldenrod, as well as surrounding houses on the block, including the Maddux residence, before deciding to execute the felony arrest warrant. At the time the officers converged on the 2600 block of Goldenrod to apprehend the subject of the felony arrest warrant, Maddux, her husband, and their son, who also resided with them, were hosting a backyard barbecue with several friends in attendance.

The parties have throughout offered fundamentally different

---

"right protected—that of presumptively innocent people to be secure in their homes from unjustified forcible intrusions by the Government," and found that the balance favored the latter.

accounts of the ensuing events. According to Maddux, as she stood in the laundry room of her residence, she was suddenly confronted by an unknown individual who entered without consent, pointed a gun at her, and demanded to know who was inside her house. Maddux claims that the individual failed to identify himself as a police officer and that she assumed that he was an armed intruder. She believed that her safety, and that of the other individuals in the house, was in jeopardy. Maddux was unable to answer the individual's question and continued to stand in her laundry room, describing her demeanor as "totally shocked," "thinking 'I'm never going to make it.'" She alleges that the individual pushed her aside and encountered a guest whom he led at gunpoint to the backyard of the Maddux residence where others were also being detained by other officers. Maddux maintains that certain individuals overheard a police radio transmission advising officers that the subject of the felony arrest warrant was in fact at the "corner" house, 2635 Goldenrod.

It was Plaintiffs', and is now Maddux's, theory that City officers thought, based on the surveillance that afternoon, that the suspect would be found at either 2635 or 2631 Goldenrod. Acting on that information, Maddux alleges that the officers intended to, and in fact did, enter both residences without a search warrant. Officers testifying at trial admitted that exigent circumstances were lacking. Maddux contends that City officers entered her residence without consent because they believed, in

-4-

accordance with their knowledge and familiarity with the Pasadena Police Department's Rules and Procedures Manual, that they were authorized to do so inasmuch as available information placed the subject at one of the two residences.

In contrast, the City contends that when officers arrived at the neighborhood, they observed several individuals in the backyard of the Maddux residence, and that a radio transmission advised that the subject of the felony arrest warrant might be among the individuals mingling in that group.  The City alleges that, before officers located the subject of the felony arrest warrant, the City alleges that two officers proceeded to the backyard of the Maddux residence to secure the surrounding area in consideration of the safety of the neighbors and the officers involved.  Officers reportedly instructed those present to move either inside the house or to the front of the house out of harm's way.  Other officers then requested and obtained consent to enter 2635 Goldenrod, where they located the subject and took him into custody.

**B.     Pre-Trial Disposition and Motion for Judgment as a Matter of Law**

The City moved for summary judgment on Plaintiffs' claim brought pursuant to § 1983.  Plaintiffs argued that the City Police Department's written policy, found in its Rules and Procedures Manual, authorized officers to execute felony arrest warrants on a private residence, where the subject in fact does not reside but is

nevertheless believed to be, in violation of *Steagald*.[2] The City defended the constitutionality of its written policy and attested to its "long-standing custom and practice" of training and requiring officers to obtain consent before entering any residence for purposes of executing a felony arrest warrant. The district court denied summary judgment, citing the factual issues created by "the parties' radically conflicting accounts of the actual events occurring on June 3, 1998 at the Maddux residence."

The case proceeded to a jury trial, and at the close of Plaintiffs' case, the City orally moved for judgment as a matter of law, on the grounds that Plaintiffs failed to demonstrate that the City espoused an official policy or custom allowing officers to execute arrest warrants in violation of the Constitution or laws of the United States. The City asserted, to the contrary, that its practice and custom was to abide by the Constitution and laws of the United States, as evinced both in its written policy and in its practice of securing consent before executing a felony arrest warrant at a third-party residence. According to the City, even taking as true Plaintiffs' allegations that one or more officers entered the Maddux residence in the absence of one of the *Steagald* exceptions (consent, exigent circumstances, or a search warrant), such conduct was in contravention of the City's official policy.

The City cited as an additional justification for granting

---

    2 The relevant passage, section 90.06 of the Rules and Procedures Manual, is quoted in full and discussed in greater depth in Section V.

judgment in its favor Plaintiffs' inability to identify the officer alleged to have entered the Maddux residence. The district court did not reach this argument.

Plaintiffs countered that, in the twenty years since *Steagald*, the section of the Rules and Procedures Manual pertaining to the execution of arrest warrants had not been modified to instruct law enforcement officers of the steps that are constitutionally required to search a third party's residence for the subject of an arrest warrant. Plaintiffs repeatedly characterized the City's written policy as affirmatively unconstitutional in attempting to persuade the district court that the instructions with regard to execution of arrest warrants in the Rules and Procedures Manual were the "moving force" behind the officers' violation of their Fourth Amendment rights.

**C. The District Court's Grant of Judgment as a Matter of Law**

In publishing its ruling from the bench, the district court made two findings, either of which would have been decisive of the Rule 50 motion.

First, even accepting as true Plaintiffs' version of the events, *i.e.*, that the officers actually entered the Maddux residence, the district court was persuaded that the officers had not acted intentionally. Rather, they had accidentally entered the Maddux residence in the mistaken belief that the subject of the arrest warrant would be found at 2631 Goldenrod. The officers'

negligent violation of Plaintiffs' constitutional rights would not, according to the district court, be cognizable in a § 1983 claim. The district court raised this issue *sua sponte*; the City did not argue the absence of a constitutional deprivation as a basis for its Rule 50 motion.

Under the twin assumptions that the officers had (1) intentionally (2) entered the Maddux residence, the district court then addressed the City's contention that Plaintiffs had failed to demonstrate that the City, by means of an official policy, was responsible for the alleged deprivation of Plaintiffs' constitutional rights. In doing so, the district court shifted its focus to the quantum of evidence adduced to show that an official policy or custom was the impetus for the deprivation of Plaintiffs' constitutionally-protected rights. The issue then before the district court was whether the officers, in entering the Maddux residence in the absence of the *Steagald* exceptions, acted in accordance with a policy officially adopted and promulgated by the City with deliberate indifference to the known and obvious consequence that the policy could subvert Plaintiffs' constitutional rights.

With regard to evidence presented, the district court found that the City's official policy was to train and require its officers to obtain consent before entering a residence of a third party to execute a felony arrest warrant. In the judgment of the

district court, if consent was required as a matter of course in every instance in which an arrest warrant was to be executed, as the City maintained that it was, then the City's custom and practice could not be interpreted as running afoul of the Fourth Amendment. The City, according to the district court, relied upon "one of three methods that the officers could employ and still be in compliance with the constitutional requirements of . . . executing an arrest warrant at the home of a third party, which is consent, exigent circumstances, or a search warrant." The district court commended this custom the City had in place as having been "designed to assure that constitutional violations would not result."

The district court reasoned that with this policy in place Plaintiffs were unable to show that the City acted intentionally to deprive them of their right under the Fourth Amendment to be free from an unreasonable search of their home. In the perceived absence of any evidence of a policy statement, custom, or practice enacted by the City in deliberate indifference to the constitutional rights of its citizens, the district court determined that the issue of municipal liability under § 1983 could not proceed to the jury.

The record indicates that the assistant chief of police, and those officers who had been called by the Plaintiffs as adverse witnesses, were avowedly unaware that a United States Supreme Court opinion had distinguished the privacy interests with which law

-9-

enforcement officers had to contend in executing arrest warrants. But the district court found that the City's dereliction in altering its Rules and Procedures Manual, so as to reflect the distinctions made in *Steagald*, fell short of the necessary showing of deliberate indifference. She noted, "the fact that they were negligent in not understanding or training or explaining to their officers that an additional method of assuring that constitutional violations would not result in the securing of a search warrant, does not result in municipal liability."

Thus, the district court held that if the officers in fact acted in violation of the City's policy, the negligence of those officers could not be attributed to the City under a theory of *respondeat superior*. The United States Supreme Court indeed has consistently rejected arguments for imposing vicarious liability on municipalities for the actions of their employees under § 1983 since its decision in *Monell v. Department of Social Services*.[3]

Although Plaintiffs argued that the written policy regarding the planned execution of arrest warrants in the Rules and Procedures Manual was affirmatively unconstitutional, the district court insisted that the City trained officers to get consent first. In fact, the district court's scrutiny of the language in the Rules and Procedures Manual was confined to its assessment that the written policy did not, by omission or otherwise, convey that a

---

3 436 U.S. 658 (1978).

search warrant was not required to enter a third-party residence.

In conclusion, the district court noted the absence of any "legally sufficient evidentiary basis for a jury to find for any of the plaintiffs with respect to the allegations in the lawsuit." The district court then proceeded to grant the motion for judgment as a matter of law in favor of the City as to all Plaintiffs, and to dismiss the jury.

## II. Standard of Review of Judgment as a Matter of Law

On appeal, Maddux broadly phrases the issue as whether the City is liable for the conduct of its officers in entering the Maddux residence in the absence of the *Steagald* exceptions, in light of the Pasadena Police Department's Rules and Procedures Manual's seeming endorsement of such unconstitutional measures. Specifically, Maddux takes issue with the district court's two dispositive findings: (1) that the officers did not act intentionally, if at all, and (2) that the City's official policy was to require and train its officers to get consent before entering all private premises to execute felony arrest warrants.

Federal Rule of Civil Procedure 50(a)(1) permits a district court during a jury trial to enter judgment as a matter of law against a party with respect to a claim or a defense, but only if that party "has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find

for that party on that issue."[4]  We review *de novo* a district-court ruling on a motion for judgment as a matter of law.[5]  Thus, like the district court, we must review the record as a whole, taking care to draw all reasonable inferences in favor of the nonmoving party and to abstain from making credibility determinations or weighing the evidence presented to us.  Likewise, as to evidence supporting the moving party, we must credit only that which is uncontradicted, unimpeached, and unattributable to interested witnesses.[6]

Judgment as a matter of law is appropriate only in the rare instance in which the facts and inferences favor one party so profoundly that reasonable minds could not disagree.[7]  When confronted with "evidence of such quality and weight that reasonable and fair-minded [people] in the exercise of impartial judgment might reach different conclusions" a district court should deny the motion for judgment and submit the case to a jury.[8]  The

---

4 Fed. R. Civ. P. 50(a)(1); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000).

5 *Anthony v. Chevron*, 284 F.3d 578, 582-83 (5th Cir. 2002).

6 *Phillips* ex rel. *Phillips*, 311 F.3d 369, 373 (5th Cir. 2002), *cert. denied*, 123 S. Ct. 2274 (2003) (noting that in *Reeves*, 530 U.S. at 150-51, the United States Supreme Court had clarified this as the approach to be taken in granting judgment as a matter of law).

7 *See Piotrowski v. City of Houston*, 237 F.3d 567, 576 n.9 (5th Cir. 2001) (citing *Rutherford v. Harris County*, 197 F.3d 173, 179 (5th Cir. 1999)).

8 *Mosley v. Excel Corp.*, 109 F.3d 1006, 1009 (5th Cir. 1997) (quoting *Boeing Co. v. Shipman*, 411 F.2d 365, 374-75 (5th Cir. 1969) (en

district court should be mindful, that "it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses."[9]

### III.  Section 1983 and Municipal Liability

Without conferring any substantive rights, § 1983 instead creates a cause of action against any person who, acting under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution or laws of the United States.[10]  The United States Supreme Court designated municipalities as persons to whom § 1983 applies and articulated the standard for imposition of municipal liability under § 1983 twenty-five years ago in *Monell*.[11]  To establish municipal liability under § 1983 for the actions of a governing body's officials, the aggrieved individual must prove that an official policy is responsible for the claimed deprivation of the federally-protected right that is at issue.[12]

Although official policy is generally to be found in policy statements, ordinances, regulations, or decisions formally adopted

---

banc)).

9 *Id.*

10 42 U.S.C. § 1983.

11 *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978).

12 *Id.*

and promulgated by the governing body or individuals with policymaking authority, a policy may also be evinced in "a persistent, widespread practice of city officials or employees . . . so common and well settled as to constitute a custom that fairly represents municipal policy."[13]  If the official municipal policy is embodied in a custom, the governing body or policymaking individuals must have either actual or constructive knowledge that such custom prevails.[14]  Actions not attributable to execution of an official policy, in whatever form, will not subject the municipality to liability under § 1983.

In prosecuting her claim against the City under § 1983, Maddux, in addition to establishing the predicate violation of the underlying constitutional right,[15] was required to: identify a municipal policymaker with actual or constructive knowledge of the policy that was alleged to have caused her injuries; isolate and present evidence of the official policy of which she was complaining; and show that her alleged injuries were incurred as a result of the law enforcement officers' execution of that official

---

13 *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) (en banc); *see also Bd. of County Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 405-07 (1997) (citing *Monell*, 436 U.S. at 690-910.

14 *Webster*, 735 F.2d at 841.

15 *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1573-74 (5th Cir. 1989), *cert. denied*, 493 U.S. 1019 (1990).

policy, otherwise referred to as the "moving-force" requirement.[16] Thus, our decisions insist upon adequate evidence of "both municipal culpability and causation," in order to prevent imposition of liability founded on a theory of *respondeat superior*.[17]

As long as causation is established, an official policy that is facially unconstitutional evinces municipal culpability without more, terminating the inquiry. In contrast, a facially innocuous policy will support municipal culpability only if it was promulgated with objective deliberate indifference to the "'known or obvious consequences' that constitutional violations would result."[18] Thus, this Court has previously concluded that as to each policy to which a plaintiff is pointing in support of her claim for municipal liability under § 1983, "it must be determined whether each one is facially constitutional or unconstitutional."[19]

---

16 *Piotrowski v. City of Houston*, 237 F.3d 567, 578-80 (5th Cir. 2001)(citing *Monell*, 436 U.S. at 694); *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984).

17 *Piotrowski*, 237 F.3d at 578 n.17, 580 (citing *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998)).

18 *Id*. at 579 (quoting *Bryan County*, 520 U.S. at 407). The burden for proving deliberate indifference is necessarily high, such that "a showing of simple or even heightened negligence will not suffice." *Id*. (citing *Bryan County*, 520 U.S. at 407).

19 *Id*. at 579-80.

## IV. Constitutional Deprivation: Negligent Conduct vs. Intentional Conduct

### A. Finding of Negligent Conduct

Maddux urges that the district court erred when, without reaching the issue of municipal liability, it found that Plaintiffs had failed "to establish that the defendants acted intentionally with respect to the constitutional rights that they [Plaintiffs] allege have been violated." Maddux contends that the district court impermissibly weighed the evidence and determined the credibility of testifying witnesses at trial when it concluded that the officers, if they did in fact enter the Maddux residence, did so by accident, in the mistaken belief that they were supposed to be in that house and not the one next door. The district court characterized such a scenario as "negligence which is not cognizable as a claim in this case."

Maddux suggests why the officers reasonably believed that the subject of the arrest warrant might be found at the Maddux residence and, thus, why at least one officer intentionally entered the Maddox house looking for the subject of the felony arrest warrant. Maddux's sons, Gary Maddux and Bryan Maddux,[20] both testified that they heard police radio transmissions advising officers that they were at the "wrong house." Maddux argues that this testimony, coupled with that of one officer who understood

---

20 Only Gary Maddux was present during the alleged entry.

that the subject of the arrest warrant could be found at either of the two houses on Goldenrod, or that of another officer who thought the subject was going to be found in the Maddux residence, supports the equally logical inference that the officers intended to enter both residences in an attempt to locate the subject, and that any reference to the "wrong house" could simply have meant that the subject had been located at the *other* of the two residences. Maddux thus insists that the officers had formed a belief that the subject was in one of the two residences, and that the ensuing radio transmissions informing the officers that they were in the "wrong house" served only to advise that the subject was in fact at 2635 Goldenrod and not the Maddux house.

The district court deduced otherwise, concluding that the evidence *only* supported the finding that the officers were merely confused about where they were supposed to be. The transcript of the trial contains the district court's observations pursuant to its ruling:

> Even ignoring all of what the defendant officers have to say about the facts as they occurred on that day and taken [sic] as true the statements that were made by the plaintiffs with respect to the actions of the officers, two of the plaintiffs testified that while the officer was in the home and one while he was outside of the home, that they heard evidence that the officers had not intentionally but accidentally gone to the wrong house, which the Court finds makes it difficult if

-17-

not impossible, for the plaintiffs to establish that the acts of the officers were committed intentionally.

## B. The Testimony

Plaintiffs called nine witnesses over the two-day duration of their case, including several plaintiffs, officers and others assembled at the time of the incident, and Assistant Police Chief Cunningham. A summary of these witnesses' testimony, with regard to the issue of whether a predicate constitutional deprivation was credibly presented, follows.

Two witnesses are of no assistance in this endeavor.[21] But, assessments of the credibility of the seven remaining witnesses, each of whom offered testimony relevant to this issue, would have enabled the jury to assess the credibility of the various conflicting statements and to determine whether the officers, if they did enter the Maddux residence, did so intentionally.

Bryan Maddux, who arrived as officers were attempting to locate the subject of the felony arrest warrant, observed officers in the area surrounding his parents' house, though not inside the residence. Bryan Maddux testified that he overheard a radio transmission telling officers that they were at the "wrong

---

[21] Arleen Maddux testified that she was shocked and feared for her life while confronting an unknown, armed individual inside her home. Maddux claims that she did not know that the individual was an officer, and she was further unable to identify him from among those officers present at the scene of the arrest. So, she does not claim to have knowledge of whether the officers realized they were at the "wrong house." Assistant Police Chief Cunningham is also silent on the issue, as he was not present at the scene.

address."

Dale Oldfield was among the three individuals — Arleen Maddux and Gary Maddux included — who claimed that while inside the Maddux residence, he had encountered an unknown individual clad in black and displaying a gun.[22] Oldfield testified that the unknown individual asked him who he was and whether he knew another named individual, presumably the subject of the arrest warrant. After Oldfield exited the house and walked into the backyard as he had been instructed to do, he overheard a garbled radio transmission from which he was unable to distinguish any coherent communication. But he did note that following the transmission, several of the officers within his view retreated from the vicinity of the Maddux residence and converged on the residence at 2635 Goldenrod.

Maddux's other son, Gary, was living with his parents at the time and was home that afternoon. He testified that the unknown individual whom he encountered inside the Maddux residence said nothing to him other than ordering him to go outside to the backyard. Gary Maddux complied and, according to him, overheard a radio transmission informing officers that they were at the "wrong house." At that point, Gary Maddux walked back inside his parents' house without opposition from any officers.

Lieutenant Michael Jackson, the senior officer at the scene, offered testimony rife with contradictions. He testified that it

---

22 The district court found that Oldfield had no expectation of privacy in the Maddux residence, which ruling Oldfield did not appeal.

-19-

was his understanding that although a confidential informant had identified 2635 Goldenrod as the residence where the subject of the arrest warrant could be located, the officer who conducted the preliminary surveillance of the neighborhood had observed unknown individuals traveling back and forth between 2635 Goldenrod and the Maddux residence at 2631 Goldenrod. Lieutenant Jackson was among several officers advised by radio transmission that "there was foot traffic between the two residences at the time we were in the area." He testified that the information he had received indicated to him that the subject could be "going back and forth between the backyards of the two [residences] and inside the corner house [2635 Goldenrod]."

Lieutenant Jackson added later that, upon arrival, he and Officer Tracy Marshall proceeded to the Maddux backyard, but that their focus was the residence next door where the subject was believed to be. On cross-examination, Lieutenant Jackson testified that it was not the intent of the officers executing the arrest warrant to enter the Maddux residence. But in a followup question referring Lieutenant Jackson to his earlier averments in a sworn statement, Lieutenant Jackson acknowledged that, at the time, there was some reason to believe that the subject might be inside the Maddux residence, because an attempt might have been made to elude police and traffic between the two residences had been reported.

Officer Candelari drove the confidential informant to the 2600 block of Goldenrod where the informant identified the house at 2635

Goldenrod as the residence where the subject of the arrest warrant could be located.  Officer Candelari dropped off the informant and returned to the area near the 2600 block of Goldenrod to conduct surveillance of 2635 Goldenrod from a comfortable distance with the use of binoculars.  Significantly, he did not know exactly what the subject of the warrant looked like; only a bare description of height, weight, and perhaps hair color had been provided to him. Officer Candelari testified that during his surveillance, he noted several individuals who "could have possibly matched that description."  In his radio transmission, he indicated that he saw "traffic" going between 2635 Goldenrod and 2631 Goldenrod; he did not say that he had actually seen the subject or that the subject would only be found at 2635 Goldenrod, the residence identified by the informant.

In an effort to clarify his earlier statement, Officer Candelari then testified that, despite using the word "traffic" in his radio transmission, he had only seen several individuals in an area between the two houses, not necessarily traveling back and forth from one to the other.  He testified that he was not certain what they were doing — only that they were leaving that area between the two houses, and "disappearing between the two residences."  What is significant is that these officers only heard what had been related in the radio transmissions without the benefit of Officer Candelari's clarification of what he actually saw.  When the other officers converged on the scene to execute the

-21-

felony arrest warrant, Officer Candelari proceeded with them to 2635 Goldenrod, where consent was given to enter and where the subject was eventually located. He recalled seeing still other officers in the front yard of the Maddux residence as well.

Officer Marshall testified that the information he received in advance of the operation undertaken to execute the felony arrest warrant indicated that the subject could be located at one of two houses, either 2635 or 2631 Goldenrod. He understood that individuals had been seen going back and forth between the two houses, such that officers were uncertain in which house the subject would ultimately be found. Officer Marshall and other officers received this information along with other officers at what appears to have been an informal briefing immediately preceding their arrival at the scene. Once there, Officer Marshall proceeded to the Maddux backyard in order to secure the safety of the people there and to assist in arresting the subject if he was located in that vicinity. Officer Marshall agreed with Plaintiffs' counsel during his direct examination that as far as Officer Marshall was aware, the subject could have been at the Maddux residence "just as easily as he could have been at the corner residence [2635 Goldenrod]." At some point during the time he was engaged in the backyard of the Maddux residence, Officer Marshall received a radio transmission informing him that the subject had been found next door at 2635 Goldenrod. This is consistent with the Plaintiffs' explanation that the "wrong house" message meant

-22-

that the subject of the arrest warrant had been located in the house next door to the Maddux home.

Finally, Officer Isaac Villareal testified that before arriving at the 2600 block of Goldenrod, he had understood that the subject would be located at the Maddux residence and not the neighboring residence at 2635 Goldenrod. He proceeded to the Maddux residence in the hope of arresting the subject. Officer Villareal said that he remained outside the Maddux residence, questioning individuals in the driveway of the home, until he received a radio transmission alerting him that the subject was at the other residence.

## C. A Question for the Jury

Officer Villareal is apparently the only witness to have stated unequivocally that he was operating under the assumption that the subject would be found at the Maddux residence, rather than the house next door or either of the houses as related by Officer Candelari, who conducted the surveillance. Officer Villareal's testimony was not developed to an extent that either the district court or the jury could have determined with any certainty whether he had actually been told that the subject was supposedly going to be, or could be, found in the Maddux residence, *i.e.*, whether he believed that information had been obtained that the subject was believed to be at a third-party residence at 2631 Goldenrod, or whether he was merely confused about the information

-23-

that had been relayed during the briefing for officers participating in executing the felony arrest warrant. Assuming that one or more officers did enter the Maddux residence, a patent variance in the testimony as to whether they did so intentionally was evident even before Officer Villareal testified.

Bryan and Gary Maddux both reported hearing the same radio transmission using the words, "wrong house." Neither of them overhead anything more substantive that might have clarified what exactly was meant by the transmission. The district court concluded, based on the testimony of these two individuals alone, that only one meaning could have been assigned: that the officers who purportedly entered the Maddux residence did not do so on purpose, but in the mistaken belief that the subject was supposed to be in the house where the Maddux family resided and not in the one next door at 2635 Goldenrod. Implicit in the ruling was the district court's belief that the officers involved never anticipated that the subject might be located at either house, but instead had identified *one* house as *the* location where the subject was reasonably expected to be; and that certain officers might have thought that the Maddux residence was the correct location and accidentally gone there.

But the equally reasonable inference — and certainly the one more favorable to Plaintiffs as non-movants — was that advanced by Maddux during the Rule 50 arguments at the close of her case and in

the brief she submitted to this Court. According to this theory, which is amply supported in the testimonial evidence, officers descended on the 2600 block of Goldenrod with information that the subject could possibly be found at either of the two residences. Maddux thus argues that they intended to go into both houses essentially simultaneously to apprehend the subject of the felony arrest warrant.

Officer Candelari admitted that he had warned in a radio transmission relayed to other officers assembling to execute the arrest warrant that he had seen "traffic" between the two houses. That he in fact did not see actual travel in and out of the two residences is irrelevant because the officers relying on his surveillance were never fully apprised of exactly what he had or had not seen. With the exception of Officer Villareal, all of the officers who testified, including Lieutenant Jackson in his supervisory capacity, acknowledged that it was their understanding from the outset that, based on the surveillance that had been conducted, the subject could plausibly have been found in either house. Officer Marshall in particular conceded that the subject could have been found in the Maddux residence as easily as in the residence at 2635 Goldenrod.

Review of the record under the prescribed standard of review demonstrates that the district court ruled in favor of the City based in part on its erroneous conclusion that Plaintiffs had

-25-

presented no legally sufficient evidentiary basis from which a reasonable jury could have found that the predicate constitutional violation had been proven. In this regard, drawing all reasonable inferences in favor of Plaintiffs, and without judging the credibility of witnesses or weighing their testimony, a fact issue for jury consideration was presented.[23]

A reasonable jury might have found evidence of a constitutional deprivation — that the testimonial evidence and reasonable inferences therefrom did not favor the City so profoundly that reasonable minds could not disagree. The meaning of the radio transmission overheard by Bryan and Gary Maddux is equivocal,[24] but more compelling are the portions of the officers' testimony categorically endorsing Plaintiffs' — and now Maddux's — argument that both residences were targeted as private premises in which officers could reasonably expect to find the subject of the felony arrest warrant. The district court thus erred in determining as a matter of law that, even accepting as true Plaintiffs' contention that officers entered the Maddux residence on June 3, 1998, in doing so, they were at most negligent in transgressing Plaintiffs' Fourth Amendment rights.

---

23 While the district court did not explicitly state that it had to any extent considered the testimony of the officers called as adverse witnesses, the testimony had been presented during trial and was available for consideration.

24 It is unnecessary for the Court to speculate as to whether the testimony of these two individuals could, without more, have supported Plaintiffs' theory of an intentional act.

The evidence adduced as to whether Maddux's constitutional rights were intentionally violated created an issue of fact within the province of the jury.

## V. Official Policy: Written Policy vs. Unwritten Practice

### A. Finding by District Court of a Constitutional Policy and Practice

Even positing an intentional violation of Plaintiffs' constitutional rights, the district court concluded that judgment as a matter of law was nevertheless proper because Plaintiffs had not shown that either the City or its policymakers had promulgated or adopted an official policy with deliberate indifference to the known or obvious consequences that constitutional violations would result. In order to reach that conclusion and grant judgment in favor of the City, the district court determined the City's official policy to be one that requires consent to enter as prerequisite to execution of arrest warrants.

The district court found that the City had promulgated a policy designed to avoid constitutional deprivations on the order alleged by Plaintiffs. Even if officers had in fact entered the Maddux residence as part of their efforts to apprehend the subject of the felony arrest warrant, such entry without the validation of any of the three *Steagald* exceptions would only have signified the officers' direct violation of the City's policy. The officers, not the City, would then be the moving force behind any injuries sustained by Plaintiffs. Neither Plaintiffs at trial nor Maddux in

-27-

her appeal has disputed that the City's liability for the claimed constitutional violation cannot be derived from a theory of *respondeat superior*.

Instead, Maddux argues that for twenty years the City has ignored the United States Supreme Court's decision in *Steagald* and affirmatively "enacted and implemented a policy in complete derogation of this decision and the Fourth Amendment." According to Maddux, the district court erred in simply "absolv[ing] the City of an arrest warrant policy that was in clear violation of the Fourth Amendment as interpreted in *Steagald*."

The question for this Court is whether the City of Pasadena Police Department's written policy respecting the planned execution of arrest warrants constitutes a legally sufficient evidentiary basis upon which a reasonable jury could have premised the City's liability under § 1983 for a violation of Maddux's Fourth Amendment interest in being free from an unreasonable search of her home by City officers. More precisely, did the district court dismiss the jury after making a factual finding that the City's unwritten policy trumps its written policy and requires its officers to obtain permission from a person in authority before executing a felony arrest warrant at a private residence? Analysis of this issue is tangled for reasons evident from our review of the record in this case.

To begin with, it cannot be argued that the district court

decided what the City's policy for executing arrest warrants entailed. Neither the colloquy between the bench and counsel during arguments on the Rule 50 motion nor the district court's recitation of its findings helps us to understand whether or to what degree the court considered the significance of the City's written policy published in the Rules and Procedures Manual.

The City insisted that both its written policy and its practice of obtaining consent assured its compliance with the Constitution and laws of the United States. In other words, either source of policy was independently capable of surviving scrutiny for purposes of ferreting out potential municipal liability. The district court heard this argument without expressing an opinion as to whether it also thought these two sources of official policy adhered in equal measure to the Fourth Amendment. The court did state, however, that "[i]f they've got a policy that says you've got to get consent, then they don't have a policy promulgated with known or obvious consequences that a constitutional violation would result."

Thus, the district court repeatedly characterized the official policy as one of getting consent, without reconciling the wording in the Rules and Procedures Manual with an unwritten policy requiring that consent be obtained; without acknowledging a possible infirmity in the wording that was overcome by an unwritten practice; and without stating that the wording, infirm or not, was

irrelevant by virtue of that unwritten practice.[25]

**B.    The Written Policy and Creation of a Fact Issue for the Jury**

Whatever the relationship between the written policy and the unwritten practice, we conclude that it was error for the district court to find that the evidence adduced at trial led inexorably to the conclusion that the City's policy was to train and require its officers to get consent as a precondition to entering a private residence in the course of executing an arrest warrant.  That, at the close of Plaintiffs' case, the City's official policy was benign in all relevant respects was not irrefutable from the evidence.   Rather, this Court is of the opinion that: (1)the written policy in the Rules and Procedures Manual was indeed facially unconstitutional; and (2) the evidence in which the district court so firmly rooted its finding that the City required its officers to gain consent before entering a private premises to execute an arrest warrant is conflicting.  The district court's ruling granting judgment in favor of the City as a matter of law was therefore incorrect.

To begin with, we shall explain why we have concluded that the

---

25 The only manner in which the district court overtly examined the contents of the written policy was done in reference to the City's admitted failure to remain abreast of developments in Fourth Amendment jurisprudence.   She found that the City's failure to incorporate expressly in its Rules and Procedures Manual the United States Supreme Court's holding in *Steagald* and its implications for entering third-party residences to execute arrest warrants was extremely neglectful but insufficient to show deliberate indifference.

written policy is infirm.  It is necessary in doing so to return to the actual text of the section of the City's Rules and Procedures Manual dealing with planned execution of arrest warrants:

> 90.06    <u>Planned Execution of [Arrest] Warrants</u>
>
> A.   A warrant may be served at any time of the day or night.
> B.   The warrant may be served at any place, public or private, where the actor is reasonably believed to be.
> C.   When it is necessary for officers to enter a private premises to execute an arrest warrant, they will, before entering, announce their identity and purpose and demand admittance.
> D.   Announcement of identity and purpose is not necessary when exigent circumstances exist or a felony warrant is executed.
> E.   When officers are refused entry after demanding admittance, they may forcibly enter the premises in order to execute a felony warrant and secure the premises.

Maddux did not premise the City's liability on either the global import of section 90.06, or the specific language in subsection (E.), which is the portion of the written policy that this Court finds problematic in light of *Steagald*.  Though the entire Rules and Procedures Manual was admitted into evidence, Maddux urged below that it was subsection (B.) that by its terms rendered the written policy facially unconstitutional after *Steagald*.

The Court disagrees.  Section 90.06 must be read as a single, cohesive, progressive statement of the City Police Department's written policy respecting the planned execution of arrest warrants.

-31-

Subsection (A.) establishes that officers are not restricted as to when an arrest warrant may be executed; an arrest warrant may be served at any time. In logical sequence, subsection (B.) adds the requirement that officers must have a reasonable belief that the subject will be found at the place referenced in the warrant. Subsection (C.) then distinguishes the procedure to be followed when officers reasonably believe that the subject is located at a private premises: Officers must identity themselves, explain why they are at the residence, and seek (demand) consent to enter. Exceptions to the prescriptive content of subsection (C.) round out the written policy. Subsection (D.) advises that when exigent circumstances exist or officers have secured a felony arrest warrant, the identity and purpose requirements may be dispensed with. And, under subsection (E.), officers in possession of a felony arrest warrant that is to be executed at a private premises are expressly licensed to effect a forcible entry if consent to enter is denied.

It is the second caveat to the general requirements governing entry of a private premises that is objectionable. Subsection (E.) permits forcible entry of a private premises without consent, exigent circumstances, or a search warrant when officers are in possession of a felony arrest warrant. But if the subject of a felony arrest warrant does not actually reside at the private premises, then an officer's reasonable belief that the subject may be found there at the time the warrant is being executed does not

go far enough to protect the privacy rights of the third-party owner of the premises.  This is the issue to which the United States Supreme Court turned its attention in *Steagald*.

In *Steagald*, the Court reasoned that an arrest warrant constitutes only a judicial finding of probable cause to believe that the subject committed a felony and a concomitant authorization to seize the subject.[26]  An arrest warrant issues to protect the subject from an unreasonable seizure.[27]  The Court had already sanctioned reliance on an arrest warrant alone to enter a person's home to effect his arrest, having found in that case that it was "constitutionally reasonable to require him [a person for whom probable cause of commission of a felony had been established] to open his doors to the officers of the law."[28]

But if the subject of an arrest warrant is reasonably believed to be at the home of a third party, as opposed to a public place or the subject's home, the limited authority to enter the premises where the subject is reasonably expected to be is not implicit; more is required to safeguard the third party's "privacy interest in being free from an unreasonable invasion and search of his home."[29]  The arrest warrant, in such circumstances, does not carry

---

26 *Steagald v. United States*, 451 U.S. 204, 213 (1981).

27 *Id.*

28 *Payton v. New York*, 445 U.S. 573, 602-03 (1980).

29 *Steagald*, 451 U.S. at 213.

with it any derivative authority to deprive the third party of his privacy interest because the warrant did not issue to protect the third party from an unreasonable search of his home. Officers must justify such a deprivation with additional evidence that the subject of the arrest warrant is reasonably believed to be in that third person's home.[30] A judicial officer has to make such a determination. An officer's personal determination — "a judicially untested determination" — that probable cause exists to enter a third-party residence, in the absence of exigent circumstances, is "not reliable enough" to justify a search of that private premises for the subject of an arrest warrant.[31] The Court cited many examples of the "significant potential for abuse" inherent in a system administered without the benefit of "the detached scrutiny of a judicial officer."[32]

The holding in *Steagald*, according to the Court, was dictated by its earlier reasoning in cases wherein the Court held that, "in the absence of exigent circumstances . . . judicially untested determinations are not reliable enough to justify an entry into a person's home to arrest him without a warrant, or a search of a home for objects in the absence of a search warrant."[33] The search

---

30 *Id*. at 214 n.7.

31 *Id*. at 213.

32 *Id*.

33 *Id*. at 213-14 (citing *Payton v. New York*, 445 U.S. 573 (1980) and *Johnson v. United States*, 333 U.S. 10, (1948)).

of a home for a person should entail no less of an assurance that every effort has been made to guarantee the reasonableness of that action on the part of law enforcement.[34]

While subsection (E.) of the Rules and Procedures Manual is a correct statement of the law apposite to law enforcement officers entering the home of the subject of an arrest warrant in the reasonable belief that the subject will be found there, it is unconstitutional as applied to a third-party private premises where the subject does not live, regardless of any reasonable belief as to his whereabouts. *Steagald* distinguished the two interests at stake in the latter situation: (1) the suspect's interest in being free from an unreasonable seizure, and (2) the third party's interest — here, Maddux's interest — in being free from an unreasonable search of her home.[35]  If no exigent circumstances are apparent and the third party does not give consent for entry, the search of a third party's home for purposes of locating the subject of a felony arrest warrant is "no more reasonable," as viewed by the third party, "than it would have been if conducted in the

---

34 *Id*. at 214 & n.7 (adding that the second clause of the Fourth Amendment providing that "no Warrants shall issue but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized," supports the conclusion that a determination of probable cause to ensure the reasonableness of the search of a person's home for an object is equally necessary when officers are seeking not an object, but another person).

35 *Id*. at 216.

absence of any warrant."[36]  The language in subsection (E.) ignores "the right . . . of presumptively innocent people to be secure in their homes from unjustified, forcible intrusions by the Government."[37]  The City's continued maintenance of a written policy facially inconsistent with established constitutional rights renders suspect the entirety of the City's protestations respecting its purported unwritten policy for execution of arrest warrants.

The record shows that Maddux pleaded, argued, and then adduced evidence that (1) the City's official policy on forcible entry of a third-party residence to execute an arrest warrant, the subject of which did not reside there, was memorialized in section 90.06 of the City Police Department's Rules and Procedures Manual; (2) the City had every expectation that officers would follow those published rules and procedures that formed the basis of their training; (3) the Rules and Procedures Manual is intended to undergo change to keep pace with evolving law; (4) the Rules and Procedures Manual had not been amended to comply with *Steagald*; (5) the City's written policy, as embodied in the Rules and Procedures Manual, was facially unconstitutional in light of this dereliction; and (6) the City's argument that an unwritten practice of training and requiring officers to get consent, even if borne

---

36 *Id*.

37 *Id*. at 222 (acknowledging that in weighing this interest with that of the Government in enforcing its laws, the Fourth Amendment recognizes that the balance is struck in favor of protections against unreasonable searches and seizures).

out by the evidence, does not dismiss, or neutralize the effect of, the affirmatively unconstitutional written policy.[38]  Maddux was attempting to persuade the jury that officers entered the Maddux residence in the absence of all of the three *Steagald* exceptions and that their actions were sanctioned, as far as they and other officers with the Pasadena Police Department understood, by the express terms of section 90.06 in the Rules and Procedures Manual.

The significance of the entire written policy to Plaintiffs' case is evident insofar as the full text of the Rules and Procedures Manual is a part of the record, which is replete with references both to it and section 90.06 respecting the planned execution of arrest warrants.  Counsel for Plaintiffs consistently questioned the officers in regard to the prominence of the Rules and Procedures Manual in the officers' training and the Police Department's expectation that they would familiarize themselves with, and adhere to, the written policy set forth therein.

Officers were also asked specific questions about the methods prescribed for execution of arrest warrants in the Rules and Procedures Manual.  For example, in questioning Assistant Police Chief Cunningham, counsel for Plaintiffs asked whether, to his knowledge, "the manual" drew any distinction between whether the subject was believed to be at his house or the house of an innocent

---

38 For example, counsel for Plaintiffs extensively questioned Assistant Police Chief Cunningham at trial in regard to promulgation of the written rules and procedures and the emphasis the Police Department placed on strict compliance with those provisions.

third party.  Assistant Police Chief Cunningham responded that such a distinction did not exist in the written policy.[39]  An almost identical inquiry had earlier been directed to Officer Marshall, who replied that no provision of the Rules and Procedures Manual drew such a distinction.  Officer Villareal was asked the more explicit question of whether he understood from his reading of "the whole section [90.06]," that a felony arrest warrant could be executed at any place, public or private, where the actor is reasonably believed to be, even though consent is not given and exigent circumstances are lacking.[40]

In analyzing the written policy of the City, we must do so in the context of the whole.  Thus, to confine our consideration to a subsection that Maddux finds particularly troublesome, narrowly examining in a vacuum, a single sentence of section 90.06, would be inconsistent with generally applicable principles of interpretation regularly employed by this Court in the construction of a controlling writing.

The district court appears not to have discerned the extent to

---

[39] Assistant Police Chief Cunningham testified, moreover, that he did not realize until the time his deposition was taken in this case that the United States Supreme Court had in *Steagald* made specific findings with respect to the procedures law enforcement officers must follow in executing arrest warrants at third-party residences.

[40] With his few preceding questions, counsel for Plaintiffs had been attempting to elicit a response to what the witness believed was the import of subsections (c) and (d), in addition to (b).  Maddux did not expressly request that the witness read and interpret subsection (e) as well, but in directing the witness to read the whole section, the effect is the same.

which the City's written policy necessarily ran afoul of the Fourth Amendment. City officers' reliance on a facially unconstitutional written policy conflicted with the testimony offered to show that officers were in fact trained and required to secure consent before executing a felony arrest warrant at a third party's residence. The written policy provided a legally sufficient evidentiary basis from which a reasonable jury could have found that the City's official policy was other than what the district court found. The jury could have weighed the discrepant evidence regarding the City's official policy and reasonably disbelieved the testimony of certain of the officers regarding an unwritten consent requirement.

Maddux suggests that the district court "was under the mis-impression that the policy to seek consent somehow absolved the City of an arrest warrant policy that was in clear violation of the Fourth Amendment as interpreted in *Steagald*." But to reiterate, this Court has found no statement in the record that definitively tells us the manner in which the district court scrutinized the written policy. Moreover, we note that the jury, once confronted with the evidence of a written policy such as the one at issue here, alongside evidence of an alleged practice of training and requiring officers to obtain consent under circumstances akin to those at issue here, could find in effect that a policy of seeking consent absolved the City of its problematic written policy. It is plausible that the jury could believe that, though the written

policy had not been updated to reflect current law, officers were nevertheless trained in protocol that complied with decisional law interpreting the extent of the Fourth Amendment protection against unreasonable searches.

As a second matter already adverted to, the record also discloses that the district court overstated the quantity, and most probably the quality, of the testimony supporting the City's claim that, in practice, its consent requirement ensured the constitutionality of arrests effected by its officers and any searches conducted in pursuance thereof. In response to Plaintiffs' attempt to explain that officers entered the Maddux residence in a manner violative of *Steagald* and that they did so in accordance with the training that they had received, the district court rejected that characterization of the City's official policy by stating:

> Every bit of evidence is that they [the officers] were trained to get consent. . . . [Y]ou've got a policy in place that, in essence, complies with the constitutional requirements that are applicable here, because they have advised their officers to get consent.[41]

### C. The Testimony

This Court has found notable instances in the trial testimony

_____

41 The district court granted judgment for City as a matter of law based in part on a finding that the City's official policy requiring consent was "designed to assure constitutional violations would not result."

in which it was not at all clear whether at the time of the events underlying this case certain officers had received training in regard to, or otherwise knew of, the overarching consent requirement advanced by the City. Assistant Police Chief Cunningham testified unequivocally that throughout his tenure with the Pasadena Police Department, the policy had been to obtain "permission by a person in authority" before entering a private residence to execute a felony arrest warrant, but his statements were not corroborated in a consistent, coherent fashion by testimony elicited from the four other officers called by Plaintiffs as adverse witnesses.

For example, Officer Marshall testified that, at the time he assisted in executing the felony arrest warrant, he understood he would have needed consent to enter a third-party residence, in the absence of a search warrant or exigent circumstances. Counsel for Maddux later used Officer Marshall's deposition testimony to impeach his trial testimony:

> Q. Okay. And then were you asked: ". . . Since everyone is saying they did not go into the Maddux residence, my question to you is, even though you say you didn't go into the Maddux residence, was it your understanding that you had the authority to go into the Maddux residence had you wanted to do so?"
>           And your answer?
> A. "That did not cross my mind at the time I was going in the backyard."
> Q. Next question. "As we sit here today, is it your

understanding that you would have had the authority to enter the Maddux residence because you had a felony arrest warrant for [the subject of the felony arrest warrant]?"

What was your answer?

A. "If the suspect was inside that residence."

Q. Were you then asked: "So it's your understanding that if the suspect is in the residence and you have a felony arrest warrant for that suspect, then you have the authority to go into that residence to arrest that suspect?" What's your answer?

A. "If the suspect is there."

In an exchange following the impeachment, Officer Marshall testified that without consent, a search warrant or exigent circumstances, he could not enter a residence where the subject of an arrest warrant was reasonably believed to be.

Likewise, Officer Villareal's answers to similar questions were confusing and seemingly inconclusive. On direct examination, he testified thus:

Q. What were you trained?

A. In order to execute a search warrant—I mean, an arrest warrant, a felony arrest warrant, we have to obtain consent prior to going in that house.

Q. What if you don't obtain consent?

A. Then I'm not going into that house.

Q. You didn't know that at the time your deposition was taken, did you?

A. I don't know that that question was even asked. I don't remember.

In reading the relevant portion of Officer Villareal's

-42-

deposition for the jury thereafter, the following occurred:

Q. "Let's put us back at the police academy; okay? And you've got an arrest warrant for suspect A and suspect A is not in suspect A's house, he's in B's house. Does it make any difference to you in executing that warrant whether suspect A is in his own house or whether he's in B's house?"

What's your answer?

A. "It's a felony warrant. No."

Q. Okay. Isn't it true that on May 22nd, 2000, your understanding is that you had a felony arrest warrant and didn't make any difference whether he was in his own house or an innocent third party's house?

A. Correct.

Q. You've found out since your deposition that that's not the way it works; correct?

A. Correct.

Q. But the way that you were trained by the City of Pasadena is consistent with what you've said in the deposition, that it didn't make any difference which house; correct?

A. Not according to the rules manual, yes.

Q. And according to the way you were trained at the police academy; correct?

A. Correct.

Q. You also testified in your deposition, did you not, that the arrest warrant alone gave you the right to enter the Maddux residence to arrest [the subject of the felony arrest warrant]?

-43-

A. If I remember correctly, that question I replied
was I never went inside the Maddux residence.
Q. Correct. And I understand that, but the,
hypothetically, that arrest warrant gave you the
authority to enter the Maddux residence to arrest
[the subject of the felony arrest warrant]. It gave
you that authority even though you never went in the
house. Isn't that what you've testified to at your
deposition?
A. Yes.

During the subsequent cross-examination, Officer Villareal testified that the City's official policy on executing felony arrest warrants was to obtain consent to enter a residence, that he "always practiced that policy," that this comported with the training he had received, and that he had never been denied consent to enter a residence.

Finally, in one of the last series of questions asked of Officer Villareal on redirect, he was asked to read section 90.06 and answer whether it was his understanding from that section that a felony arrest warrant could be executed "at any place, public or private, where the actor is reasonably believed to be, even if you do not have consent and even if there are not exigent circumstances." He indicated that this was his understanding of the Rules and Procedures Manual, and further, that this was the way he had been trained "prior to this incident."

Officer Villareal's testimony is, in sum, puzzling. Although he seemed to give a definitive answer on cross-examination

-44-

regarding what the City's official policy for execution of felony arrest warrants was at the time of the underlying events, his answers to questions posed by counsel for Plaintiffs, both at trial and during his deposition, reasonably undercut the statements he made during cross-examination.

The testimony of Officers Marshall and Villareal alone was sufficient to create an issue of fact regarding the existence of a consent requirement. In particular, Officer Marshall's, and possibly Officer Villareal's, knowledge of what was required to execute a felony arrest warrant at a private premises, at the time relevant herein, seems to coincide with section 90.06 of the Rules and Procedures Manual, according to their own statements. Thus, reasonable jurors could find that at least these officers were following, and indeed may only have known of, the procedures set forth in section 90.06.

At a minimum, the testimony elicited raises a factual question as to what City officers seeking to execute a felony arrest warrant at a private premises were trained to do if consent was withheld. Officer Marshall's deposition testimony indicated his belief that, so long as he held a valid felony arrest warrant, his entry by whatever means necessary was validated. The law does not condone such a course of action if the subject in fact is not in residence, no exigent circumstances exist, and no search warrant has been procured to protect the privacy interest of the third-party owner. Viewed in the light most favorable to Plaintiffs, this evidence

conflicts with the evidence that the officers were trained to get consent, demonstrating that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions on this issue.

Though the City may ultimately prove that it trained its officers to seek consent before entering a private residence to execute a felony arrest warrant, the record raises a salient factual question that precludes judgment as a matter of law. Did the City and its officers apprehend that if an innocent third party withheld consent to enter her home, officers would then be unable to enter forcibly in the absence of exigent circumstances or a search warrant? It does not appear that officers were made unaware that in executing a felony arrest warrant, the United States Supreme Court had drawn from its interpretation of the Fourth Amendment proscription of unreasonable searches a fundamental distinction between the circumstances under which law enforcement officers could lawfully enter the subject's home, as opposed to that of an innocent third party. The written policy condoned forcible entry of a third-party premises despite the absence of the *Steagald* exceptions, and certain testimony in the record causes us to question whether the City in practice went any further in protecting the privacy interests of third parties caught in the melee.[42]

---

42 Assistant Police Chief Cunningham testified that in his view, *Steagald* had not changed the City's policy in any way. He stated that

Paradigmatically, a district court regarding a Rule 50 motion under these circumstances would thoroughly study the entirety of the written policy, as well as evaluate the testimony of the officers on the issue of consent. The district court would itself only rule as to the substance of the City's official policy if the facts and inferences favored one party so profoundly that reasonable minds would be incapable of disagreeing. Beyond cavil, it is critical that the district court be certain that no factual issue remains in order to justify taking a case from the jury.

## VI. District Court's Order Excluding Evidence of an Alleged Similar Incident

As part of an omnibus motion in limine before trial, Defendants sought to exclude from the jury's consideration any evidence relating to an alleged warrantless entry of another third-party residence by City of Pasadena police officers attempting to arrest a felony suspect.[43] The City argued, among other grounds, that such evidence was irrelevant, unduly prejudicial, and had the

---

he had nevertheless "informed" his officers "as a supplement, [or] additional guidance," that if consent was withheld when they need to execute a felony arrest warrant at a third-party residence, they need a search warrant to ensure that the law is followed. Assistant Police Chief Cunningham regards *Steagald* as merely a "supplement" because according to him, "the issue has never come up" and "[n]o one's complained."

43 The incident in question occurred on March 19, 1998, less than three months before officers allegedly entered the Maddux residence.

potential to confuse the issues and mislead the jury. Plaintiffs intended to use the evidence to prove that, as a result of the City's written policy respecting the planned execution of arrest warrants, a persistent and widespread practice inhered whereby felony arrest warrants could be executed at the home of a third party in the absence of exigent circumstances and without first obtaining consent or a search warrant. The district court granted that portion of the City's motion in limine by Order of December 7, 2000.

Maddux submits that the district court erred in granting the City's motion for two reasons: (1) the longstanding position of this Court that a separate, isolated incident is insufficient to prove a persistent and widespread practice of a municipality "should not apply where there is a written policy that may be inferred to cause a persistent practice;" and (2) the evidence of this "identical situation" is admissible to contradict the City's assertion that its officers always sought consent before entering a private premises to execute a felony arrest warrant.

We review a district court's evidentiary rulings for an abuse of discretion, reserving the harmless-error doctrine for any perceived miscues.[44] Although the district court apparently made no findings on the record in support of its decision, we cannot

---

44 *United States v. Moody*, 903 F.2d 321, 326 (5th Cir. 1990) ("The admission or exclusion of evidence at trial is a matter committed to the discretion of the trial court.").

say, based on the evidence and the arguments before us, that it abused its discretion in excluding this evidence.

Two affidavits submitted by the couple who owned the home in the alleged similar incident describe the events attendant to the City officers' entry for purposes of apprehending an individual identified in an arrest warrant.[45] Maddux refers us to no other evidence adduced in support of her contention of error. Insofar as neither affiant avers facts that would tend to demonstrate that their home should in fact be considered a third-party residence, Maddux has not proved that the incident in question was sufficiently similar to the alleged entry of the Maddux residence. Further, Maddux provides no sound basis for our departure from this Circuit's rule that a persistent and widespread practice so common and well settled as to constitute a custom or policy cannot be founded on mere "isolated violations."[46]

Maddux sought to introduce evidence of this one incident, which without more, even assuming its relevance, exemplifies the

---

45 Ted and Lisa Barta, the owners of the home that City officers entered on March 19, 1998 for purposes of apprehending an individual identified as Escobar, each signed affidavits describing the events attendant to their entry.

46 *Bennett v. City of Slidell*, 728 F.2d 762, 768 & n.3 (5th Cir. 1984) ("Sufficient duration or frequency of abusive practices, or other evidence, must warrant a finding of knowledge on the part of the governing body that the objectionable conduct has become customary practice of city employees.").

type of isolated civil rights violation referred to above.[47] Because Maddux was unable to show that the district court clearly abused its discretion in excluding this evidence, the district court's decision as to this portion of the City's omnibus motion in limine is affirmed.

## VII. Conclusion

Special difficulties confront trial judges charged with reviewing all of the evidence before them as prelude to ruling on a motion for judgment as a matter of law in the midst of trial. Nevertheless, the district court improvidently granted judgment as a matter of law for the City of Pasadena in this case, which presented a complicated set of conflicting facts.

We reiterate that judgment as a matter of law at this stage of the proceedings is appropriate only where the facts and the inferences resolve themselves into a single reasoned conclusion. Here, the record contains conflicting evidence as to both the intent of the officers who allegedly entered the Maddux residence and the existence of the oral policy and its displacement of the unconstitutional written one.

Resolution of those disputed fact issues should have been left to the jury. For these reasons, a new trial must be granted.

**REVERSED and REMANDED.**

---

47 Even the "short pattern of conduct" that may sometimes prove sufficient to demonstrate a custom when the violations are "flagrant or severe" does not necessarily contemplate *one* similar incident. *Id*. at 768.